## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK FIELD,<br><br>                              Plaintiff,<br><br>               v.<br><br>FRANKLIN TOWNE CHARTER HIGH SCHOOL, THE BOARD OF TRUSTEES OF FRANKLIN TOWNE CHARTER HIGH SCHOOL and JOSEPH VENDITTI,<br><br>                              Defendants. | CIVIL ACTION NO:<br><br>JURY TRIAL DEMANDED |

### I.      INTRODUCTION

1.      Plaintiff, Patrick Field ("Plaintiff"), brings this action against Defendants, Franklin Towne Charter High School ("FTCHS"), the Board of Trustees of Franklin Towne Charter High School, and Joseph Venditti ("Venditti"), for ongoing wrongful retaliation against Plaintiff, in violation of Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, the Pennsylvania Whistleblower Law, defamation and for false light, for voicing his opposition to Defendants' discriminatory student admissions practices that unfairly excluded students based on their race and disabilities.

### II.      JURISDICTION AND VENUE

2.      This action arises under Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, 42 U.S.C. § 1981, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et seq.*

3.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

4.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §
1391(b) because the acts proscribed by 42 U.S.C. § 2000d *et seq.*, 42 U.S.C. § 2000e *et seq.*, 42
U.S.C. § 12101 *et seq.,* 43 P.S. § 1421 and otherwise complained of herein took place in this
judicial district, and is also proper pursuant to 28 U.S.C. § 1391(c), because at all times material
and relevant, Defendants transact and transacted business in this judicial district.

5.      All jurisdictional prerequisites to bringing suit have been satisfied, including
issuance of a Right to Sue letter by the Equal Employment Opportunity Commission ("EEOC")
and all claims asserted in this action are timely pursuant to applicable law and operative
agreements between the parties.

### III.    PARTIES

6.      Plaintiff, Patrick Field, is a citizen of the United States and resides at 12727
Cabell Road, Philadelphia, PA, 19154.  Plaintiff served as the Chief Academic Officer ("CAO")
for FTCHS from 2013 until FTCHS placed him on paid administrative leave on May 12, 2023.
From 2006 through 2009, Plaintiff served as the Principal of FTCHS.  From 2009 through 2010,
Plaintiff served as the Chief Executive Officer ("CEO") and Principal of FTCES and continued
to serve as Principal of FTCES until 2013.  At FTCES, Plaintiff oversaw all aspects of the
operations of the school.

7.      Defendant, FTCHS, is a Legal Education Agency, organized and existing under
the laws of the Commonwealth of Pennsylvania, with its principal place of business located at
5301 Tacony Street, Box 310, Philadelphia, PA, 19137.  At all pertinent times, Venditti has
dominated and controlled FTCHS in all respects.

8.      The Board of Trustees of Franklin Towne Charter High School, actually known as
the Board of Directors of Franklin Towne Charter High School ("Board"), is a non-profit

organization, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 5301 Tacony Street, Box 310, Philadelphia, PA, 19137. The Board of FTCHS includes Board Chair, Francesco DiCianni, Board Vice-Chair, William Maher, John Carty, Board Secretary, Stephanie Cicalese, Ph.D., , Rebecca Fleming, Marissa Fitzgerald, and Ryan Keller. Nancy Hartey and Jerry Volpe are former members of the Board, who each resigned in March 2023.  The President of the Board was Joe Garbarino ("Garbarino") until February 2023.  At all pertinent times, Venditti has dominated and controlled the Board.

9.     At the time of the lottery misconduct at the center of this suit, the Board of FTCHS included Board Chair, Joseph Garbarino, Vice-Chair, Francesco DiCianni, Nancy Hartley, Jerry Volpe, John Connelly, Joseph Coughlin, and William Maher.

10.     Venditti is an individual residing at 3946 Grant Ave, Philadelphia, PA 19114, in the City and County of Philadelphia.

11.     At all pertinent times, Defendants acted as alter egos of each other, as an integrated enterprise and/or as a single or joint employer.  At all pertinent times, FTCHS and the Board have acted under the domination and control of Venditti without any material independence or ability to act independent of his instruction and approval.

## IV.     FACTUAL BACKGROUND

### A.     Introduction

12.     As required by Pennsylvania Charter school law, FTCHS holds an admission lottery every year for the admission of incoming students.  FTCHS (PA DOE Administrative Unit Number 126513450) was founded in 1999 and concurrently awarded a charter from the School District of Philadelphia.  FTCHS has since operated as a charter school under the auspices and authority of the School District of Philadelphia and serves nearly 1,300 students

from grades nine through 12 that reside in Philadelphia, Pennsylvania.  The current

administrators of FTCHS include CEO Brianna O'Donnell, Principal Jonathan Dougherty, Chief

Operations Officer Felix Simonds, Plaintiff, Director of Pupil Services and School Psychologist

Sharmon James, PhD, Director of Special Education JoAnn Attewell, and Director of

Technology Allen Hall; the Administrative Office Secretary of FTCHS is Sue McGeehan.

Plaintiff worked with these administrators daily until he was placed on administrative leave in

May 2023.

13.     FTCHS maintains ownership of the building, facilities, and premises located at

5301 Tacony Street Box 310, Philadelphia, PA, 19137.  These facilities include the following:

Building 108 and Building 109, together the main school facility; Building 12, the activity

center; and Building 215, which houses art classes and the school gymnasium.

14.     Plaintiff served as a senior administrator of FTCHS for the entire relevant period,

including as the Principal from 2006 through 2009 and as CAO from 2013 to 2023.

15.     In addition to supervising FTCHS's day-to-day operations, Plaintiff's duties

encompassed overseeing the high school's academic program, including by implementing a

school-wide curriculum, interviewing, hiring, and recruiting staff members, and supervising all

professional development.

16.     Plaintiff also has written grant applications for millions of dollars in private, state,

and federal funding aimed at helping FTCHS provide academic enrichment to its students.

17.     Plaintiff has over 18 years of combined experience working at FTCHS and

FTCES.

18.     During the course of his employment, Plaintiff learned that Defendants

manipulated the results of the purportedly random FTCHS 2023 student admissions lottery (the

"Lottery") to discriminate against applicants on the basis of their race and disabilities.
Defendants specifically eliminated applicants from the pool on the basis of race and disability
and then conducted a sham lottery process in which these students had zero chance of admission.

19.     As detailed below, in February 2023, Plaintiff became aware that Defendants
were and had discriminated against student applicants in the admissions process on the basis of
their race and disability status.  When Plaintiff reported and opposed this egregious misconduct,
he was retaliated against, as detailed below.

**B.      Charter School Student Admissions**

20.     As required by Pennsylvania Charter school law, FTCHS holds an admission
lottery every year for the admission of incoming students.  The Lottery occurs in mid-January in
the FTCHS auditorium and is digitally recorded.

21.     At FTCHS, student applicants must be Philadelphia residents to participate in the
Lottery and must have submitted applications prior to the deadline.

22.     The Lottery uses a Board-approved computerized random generation of student
names to select students for admission based on a list of students who submitted applications.
FTCHS typically selects about 350 to 380 names each year from a list of student applicant names
based on a pre-determined number of available seats for the incoming class.  The number of
available selected Lottery seats is modified by a sibling preference policy, as well as by a
preference for former students at FTCES, which is FTCHS's feeder school.

23.     FTCHS receives a high number of student applicants in part because of its
prestigious local, state, and national rankings and awards, based on overall achievements in
academics and state-mandated testing, among other top rankings within the factors used to judge
and compare schools.  Beginning in 2006, FTCHS transformed itself from one of the lowest

performing in the city to "one of the highest-achieving schools in the state," propelled by an influx of new administrators and staff using tactics from The National Association of Secondary School Principals' 1998 report "Breaking Ranks: Changing an American Institution."  Since then, FTCHS has received numerous prestigious rankings, awards, and other accolades, including the San Diego University's National Center for Urban School Transformation in 2010 for outstanding academic achievement in an urban school, the MetLife Foundation-NASSP Breakthrough School award in 2010, and was even named a National Blue Ribbon School for Academic Excellence by the U.S. DOE in 2014.

    **C.**       **FTCHS' Lottery Policies**

    24.     Pennsylvania Charter schools are required to host a random lottery admissions process if they receive more applicants than the available spots.  *See* 24 P.S. Education § 17-1723-A.

    25.     The Charter Schools Office for the School District of Philadelphia, which authorizes charter schools operating throughout Philadelphia, allows these schools to show preference to some applicants based on the terms of their charter and enrollment policy. Acceptable factors for such preference include preference for potential students who have siblings currently attending the school, preference for specific feeder school attendees, or preference for the children of the charter school's founders.  *See* 24 P.S. Education § 17-1723-A(6).

    26.     The Board of FTCHS has, since 2014, included a sibling preference policy in the Lottery.  To qualify for sibling preference, a student must have a shared legal guardian or shared legal custody with a currently enrolled FTCHS student or be a biological, half, or step sibling of a currently enrolled FTCHS student.  Students receiving preference in the Lottery must submit

applications just like any other applicant, but are pre-approved for automatic admission so long as FTCHS determines the student fulfills the requisite sibling qualifications and so long as the amount of sibling applicants does not exceed the total amount of available seats.  Sibling preference participants in the Lottery reduced the number of randomly selected seats prior to any random applicants being chosen.

27.     FTCHS also provides preference in the Lottery to current FTCES students.  Just like sibling preference policy, the FTCES preference policy pre-approves students for automatic admission prior to the selection of random applicants.

28.     Beyond the sibling and FTCES preference and the residency and application requirements, applicant selection is supposed to be completely random to ensure each child has an equal opportunity to attend the award-winning high school, as is required by applicable law.

29.     Other requirements to enroll, such as passing eighth grade and having updated vaccinations, are verified after the Lottery selection and prior to enrollment.  Thus, these criteria do not affect a student's ability to enter the Lottery.

30.     As CEO of FTCHS, Venditti oversaw and controlled the Lottery.  The Lottery is run by Sue McGeehan ("McGeehan"), FTCHS's administrative office secretary, who reports directly to Venditti, and Plaintiff, as well as Rick Gephart ("Gephart"), a member of the FTCHS's IT staff under Venditti's direction and one of Venditti's relatives.  All of these individuals have participated in administering the Lottery, including Plaintiff, pursuant to the above process, as amended over time, for over the past ten years.

31.      Specifically, McGeehan is in charge of updating an Excel spreadsheet of applicants and their personal information including address, zip code, middle school, and a unique identifying number associated with each student for wait-list tracking purposes in the

event that a student is not selected in the Lottery.  This spreadsheet tracking student names also is supposed to be used to conduct a computerized randomly generated applicant selection process in real time on the day of the Lottery.

32.     The 2023 Lottery took place on January 20, 2023 at 10:00 A.M. at FTCHS.

33.     In the weeks leading up to the Lottery, as well as the months after, Plaintiff had a series of conversations with other administrators and staff directly involved in the Lottery regarding the student selection process.

34.     On January 4, 2023, Plaintiff had a one-on-one conversation with McGeehan, in which McGeehan referenced Venditti's instruction to effectively manipulate the FTCHS Lottery. Although Plaintiff did not fully understand McGeehan's reference at the time, he later learned that Venditti, acting on behalf of the Board but without its consent and without authority, and in violation of FTCHS's internal policies, directed McGeehan to manipulate the Lottery's sibling preference policy because he was tired of "bad kids" from "bad families" automatically gaining admission to FTCHS.  Specifically, Venditti had informed McGeehan of his plan and instruction to manipulate the Lottery by using an altered file that he prepared in order to prevent certain students from being selected.  To accomplish this, Gephart, who is Venditti's relative, would pre-run the Lottery for FTCHS using Venditti's manipulated file, while maintaining the illusion to the public that the Lottery was entirely random based upon a file that had not been manipulated.

35.     The following day, on January 5, Plaintiff personally overheard a conversation between Venditti and McGeehan in which Venditti effectively confirmed his plan which Plaintiff had heard referenced on the previous day.  Specifically, Venditti stated that he knew which kids he wanted from the siblings list and which ones that he did not want.  Venditti added that he would "get Rick to work his magic," apparently a further reference to his family member's

ability to pre-run the Lottery selection with additional criteria determined by Venditti, rather than based on a randomized selection process that FTCHS certifies it conducts. Although Plaintiff was concerned about these remarks, he was uncertain if Venditti was serious in his remarks and did not understand how Venditti could technically accomplish such an outcome even if he wanted to do so.

36.     When Plaintiff checked in with McGeehan on January 19, 2023, the day before the Lottery, Plaintiff asked if McGeehan was ready for the Lottery. McGeehan stated that Venditti had not sent her "the file" yet—an apparent reference to the manipulated file Venditti had effectively confirmed he would be preparing earlier that month. Later in the day, McGeehan confirmed to Plaintiff that she received Venditti's Lottery file (apparently altered) later that day.

37.     On the day of the Lottery, McGeehan, acting by and at the direction of Venditti, altered the typical Lottery script (i.e., speech) that Plaintiff would read to the crowd of parents and applicants in the FTCHS's auditorium to eliminate all references to the FTCES and sibling preference policies from Plaintiff's remarks, apparently in order to not contradict Venditti's unilateral decision to exclude students who qualified for preference from this group.

38.     Although Venditti did not personally attend the Lottery, Gephart later confirmed to Plaintiff that Venditti's intent for the Lottery was in full effect as Gephart had Venditti's "secret squirrel file" ready to use during the Lottery. When Plaintiff inquired as to what Gephart meant by the "secret squirrel file," Gephart responded that, at the instruction of Venditti, he removed student applicants "from the zip codes [Venditti] does not like." Plaintiff further pressed what this meant, and Gephart stated that Venditti had given him a list of zip codes to remove. Defendants ran the Lottery using Venditti's secret file to generate a list of selected applicants instead of the random generation process required by law.

39.     Unbeknownst to Defendants, Plaintiff obtained the internal and manipulated file Venditti used to generate the student list on February 8, 2023 from an FTCHS secretary as part of her job duties to process a student enrollment form.  Both Gephart and Venditti were out of the office at the time.

40.     The file contained details about students accepted for the Lottery, students placed on the waitlist, students with siblings at FTCHS, and students from FTCES, as well as lists of students excluded from the Lottery on the basis of race and disability.

41.     The Lottery spreadsheet contained the following details and analyses:

    a.  There were 995 student applicants for the FTCHS 2023 admissions Lottery, including 100 applicants from FTCES, 75 applicants who qualified for sibling preference, and 820 applicants who did not qualify for either of the forgoing privileges.

    b.  Of the 820 applicants without privileges, 291 were accepted into FTCHS and the rest were placed on an admission waitlist.

As detailed below, the Lottery was far from random or fair; in fact, it was discriminatory in nature and a sham.

**D.     FTCHS's Discrimination Against Students with Disabilities**

42.     Venditti's manipulated Lottery file used during the 2023 student admissions Lottery included a separate "do not take list" of eleven names of students with siblings at FTCHS accompanied by notes next to individual students' names such as "sped discipline," "behavior contract," and "academics and discipline."   These terms clearly reference special education status, as well as academic aptitude, as rationale for inclusion on this list.  This "do not take" list is located below the main list of students with sibling privilege.

43.     In prior lotteries, McGeehan and Plaintiff did not collect and report data on applicants' disability status, as this is not a criteria used to modify the random selection of

applicants and such discrimination is unlawful.  The decision to add these names to the "do-not-take" list confirms Venditti's intent to tamper with the Lottery knowingly and willfully so that disabled students, despite submitting applications and purportedly receiving an equal opportunity to be selected for admission, could not attend FTCHS.  Despite these eleven students having siblings at FTCHS, which is cause for automatic admission to the FTCHS under the school's federally-approved admissions policy, eleven students were excluded from selection for admission to this prestigious school before they could be chosen; thus, the outcome of the Lottery was fixed to include only students that FTCHS did not perceive to have a disability.

44.     In addition, FTCHS, at the direction of Venditti, knowingly and intentionally excluded applicants from Christopher Columbus Charter School in South Philadelphia to ensure that FTCHS would not be required to provide any special education students with transportation to FTCHS as part of legally mandated Individualized Education Plan requirements.

45.     The spreadsheet also contains an FTCES tab, which lists a section of students' names and information that are "not in good standing," which contained eleven names. "Students not in good standing" is not a defined term according to Board policies and not a reason for exclusion from the Lottery according to the FTCHS's internal and federally vetted process.  On the excel file, this list is located below the main list of students with FTCES privilege, who purportedly receive automatic admission to FTCHS in accordance with FTCHS's internal and federally vetted admissions policies, similar to the "do not take list" on the siblings' preference tab.

46.     In pursuit of higher test scores and with the incentive to continue to receive its many student performance-based accolades, Venditti and FTCHS discriminated against students based on disability or perceived likelihood of disability.

11

47.    Indeed, in further confirmation of Venditti and FTCHS's discrimination, Plaintiff received a phone call the week following the Lottery from a parent, who questioned why her child, a student at FTCES, was not automatically granted admission to FTCHS during the Lottery as per FTCHS's official protocol.  Plaintiff explained that he did not know of a reason why the parent's child was not automatically enrolled.  The parent then explained to Plaintiff that she called on behalf of many disgruntled parents of students with behavioral disabilities and discipline whose children were not permitted to attend FTCHS.  When Plaintiff checked in with McGeehan to confirm if some students from FTCES were not accepted, McGeehan relayed that Venditti provided FTCES a list of students "not in good standing," who were denied enrollment at FTCHS.[1]

48.    McGeehan also confirmed that Venditti received questions from the CEO of FTCES, Rodgers, challenging his denial of a special needs student applicant enrolled at FTCES, who should automatically be granted admission under the admissions policy, and confirmed that according to Venditti's crass instructions, it is not FTCHS's job to "fix" every student.

---

[1]Plaintiff learned that, several weeks after the Lottery and only after he brought his concerns regarding discrimination in the Lottery to the Chair of the Board, FTCHS has enrolled some or all of these rejected students, as well as altered the initial Lottery Excel file, in an effort to cover-up its discriminatory exclusion from the Lottery.  Unfortunately for Defendants, Plaintiff has the altered Excel file proving the discriminatory scheme undertaken by Venditti.

**E.        FTCHS's Discrimination Against Students by Race**

49.    Students were not selected randomly by zip code in FTCHS's Lottery, and further analysis reveals that student applicants were strategically and discriminatorily selected or excluded from the Lottery using zip codes, which served as a proxy for race.

50.    For example, students from fifteen zip codes were not selected, even when the population of those zip codes would, as a matter of simple statistics, warrant multiple selections in the purportedly random Lottery.

51.    There were 820 students who applied to the Lottery excluding students with sibling preferences and those who attended FTCES.  Students from 39 zip codes across the city applied for admission.

52.    291 Students were selected for admission, representing an overall acceptance rate of 35.49 percent for students without sibling or FTCES admission preference.

53.    The average rate of applicant selection across all zip codes should have mirrored this percentage within each zip code (*i.e.*, if a zip code had 17 applicants, about six applicants should have been selected, and if a zip code had 36 applicants, about 13 would be accepted). Any variance in acceptance rate within a zip code should be entirely random in any single year and any individual year's acceptance rate should be statistically insignificant.  This was not the case.

54.    Indeed, in zip code 19137, the zip code of the FTCHS building, the Lottery process accepted a whopping 97 percent of the 36 applicants (every applicant but one), a far cry from the approximate 13 students that a random lottery would select even accounting for natural variance.

55.     Zip code 19137 is one of the zip codes with the greatest proportion of White residents in the city, as 90.8 percent of residents are White.

56.     Similarly, FTCHS accepted 80 percent of applicants from zip code 19116 and 100 percent of the 17 applicants from zip code 19154.  Located in the northeastern section of the City of Philadelphia, these zip codes have only 6 percent and 6.6 percent Black residents, respectively.  Additionally, in many instances, FTCHS entirely failed to select students from primarily Black zip codes, including zip code 19146.

57.     The zip codes Venditti "does not like" are a proxy for race, as Venditti favors the whiter northern and central eastern sections of Philadelphia and failed to select applicants from many southwestern zip codes, an area that has a much larger Black population.  Venditti's geographical proxy for race becomes apparent through analysis of the racial demographics of the city in conjunction with the zip codes of applicants he excluded.

58.     FTCHS's racial discrimination in the Lottery is evident in the following two maps of Philadelphia, which were prepared based on the Lottery and demographic data by zip code.  In the map of applicants selected by zip code, the red zip codes correspond to the zip codes from which no applicants at all[2] were accepted, while the green zip codes indicate at least one applicant was selected for admission.  In the map of race in Philadelphia, green codes for zip codes in which a majority of residents are White and red codes for zip codes in which a majority of residents are Black, and grey zip codes indicate less than a fifteen percent difference in the percentage of residents that are Black and White.

---

[2]It should be noted that Venditti's failure to exclude every majority Black zip code in Philadelphia in no way undermines the fact that he did exclude and unfairly advantage zip codes based on race.  Geographical exclusions are in addition to distinctly racial-geographic discrimination.

**Map of Applicants Selected for Admission to FTCHS by Zip Code**



**Map of Majority Race of Residents by Zip Code**



59.     The above maps effectively indicate a compelling correlation between admission and race.

60.     Venditti effectively gerrymandered Philadelphia using a line in order to reduce the probability that students from majority Black zip codes are randomly chosen through a legitimate Lottery selection.  While White students received admission, Venditti has materially and intentionally prevented Black students from attending FTCHS.

61.      Philadelphia has historically experienced redlining, which refers to a set of discriminatory practices consisting of the systemic denial of services to residents of certain areas based on race or other protected status, in order to maintain or promote the segregation of certain neighborhoods.  Redlining has worked to the great historic detriment of Black residents, who faced increased barriers to apply for mortgages, loans, and other financial services, among other difficulties in obtaining housing and related services.  The Fair Housing Act of 1968 outlawed housing discrimination, including redlining, though similar discriminatory practices continued

for years afterward and persist to this day.  Venditti's exclusion of Black children from FTCHS

is equally cruel, and also likely rooted in a mistaken belief that a student's race is correlated with

student outcomes, resulting in Venditti and FTCHS denying equally deserving Black applicants

the chance to attend a prestigious high school.

62.     Philadelphia is one of the most racially segregated cities in the United States, as

evidenced by its Dissimilarity index.

63.     A Dissimilarity index calculates the extent to which different groups of people

live, such as by race, in different neighborhoods in a city.  A Dissimilarity index of zero indicates

perfect integration, in which the racial composition of each neighborhood matches the racial

composition of the city.  Dissimilarity indices range up to one hundred, which would indicate

perfect segregation in which where each neighborhood consists entirely of persons of a single

race.  The Dissimilarity index "expresses the percentage of the population that would need to

move to a different neighborhood in order for each neighborhood's racial/ethnic composition to

match that of the larger area."[3]  With a White to non-White Dissimilarity index of 59.94 in

2021,[4] Philadelphia County, PA is one of the most segregated cities in the nation, making the

city particularly susceptible to redlining and the discriminatory scheme employed by FTCHS and

Venditti, as it is easy to draw geographic lines that divide the City of Philadelphia by race.

64.     The result of the Lottery confirms that Venditti manipulated the vetted,

randomized process that FTCHS is supposed to use to comply with applicable law in favor of a

manipulated filtering of applicants based on race and disability.  Venditti's scheme was

---

[3]Joe Cortright, *America's least (and most) segregated cities*, City Observatory (August 17, 2020), available at: https://cityobservatory.org/most_segregated/.

[4]Federal Reserve Bank of St. Louis, Economic Research, *White to Non-White Racial Dissimilarity (5-year estimate) Index for Philadelphia County, PA* (last visited March 28, 2023), available at: https://fred.stlouisfed.org/.

successful in altering the pool of admitted students and deprived qualified students of having a chance for admission to which they were entitled under the law.

F.        **FTCHS's History of Discriminatory Admission Practices**

65.     FTCHS's 2023 admissions Lottery was not an isolated act of discrimination. Rather, Defendants discriminated against at least one additional student in January 2018.

66.     On January 9, 2018, a student who shall remain nameless for confidentiality purposes learned that she had been accepted to FTCHS.  Ecstatic to join this award-winning high school, this student toured the building on or about January 12, 2018.  In addition to purchasing a school uniform, the student's family completed her enrollment papers during this visit.  Set to start classes on January 19, the student also provided McGeehan with a copy of her Individualized Education Plan ("IEP"), which was created because of an emotional disability.

67.     Upon receiving this IEP, McGeehan indicated that there was no space in the special education classroom to fit the student's needs, and thus informed her she would no longer be able to enroll.  This formal denial of the student was reiterated in a formal letter from Ms. McGeehan sent on January 16, 2018.  The following day, the student's family member sent an email to Venditti describing the discrimination in detail, as well as subsequently placed several phone calls to Ms. McGeehan.  No member of FTCHS ever responded to the disabled student or her family.[5]

68.     Indeed, Venditti's view that it was not his job to "fix" every student—meaning that FTCHS would not do what was legally required to provide services for or even admit

---

[5]Further details of the student's discrimination at FTCHS are set forth in press articles about the incident.  *See, e.g.*, Greg Windle, *Franklin Towne accused of discriminating against special needs student*, Chalkbeat Philadelphia (July 19, 2018), available at https://philadelphia.chalkbeat.org/2018/7/19/22186165/franklin-towne-accused-of-discriminating-against-special-needs-student.

students who required accommodation for their disabilities—transcends the illegal 2023 Lottery. This incident of blatant discrimination without even an attempt to conceal the practice further supports the precise attitude Venditti and FTCHS have toward disabled students, as well as the lengths he would go to and went to, ensuring his discrimination was successful.

**G.       Plaintiff's Diligent Reporting to the President of the Board**

69.     Profoundly disturbed about the information he had just learned regarding FTCHS's sham 2023 Lottery, Plaintiff did not hesitate to call and inform Garbarino, then-President of the Board, of the conversations he had and personally witnessed, and immediately sent him Venditti's secret Lottery file and its commentary also contained within a follow-up email on February 8, 2023, following their phone conversation that same day.  Plaintiff also sent Garbarino the "official" FTCHS lottery file that demonstrated (when compared to Venditti's secret Lottery file) the statistical improbabilities and complained of discriminatory practices.

70.     From February 8, 2023 through February 17, 2023, Plaintiff had several telephone conversations with Garbarino and an in-person meeting to discuss Plaintiff's concerns.  During one conversation on February 17, Garbarino mentioned a plan to retain the law firm Fox Rothschild LLP to conduct a thorough investigation into the incident, but indicated that Board approval was necessary to begin the investigation.

71.     On February 21, 2023, Venditti resigned as CEO, citing medical leave and his age as reasons via an email to the Board.  Venditti's resignation at the time of the initiation of a potential investigation into his illegal action is no mere coincidence.

72.     A day later, Plaintiff had a phone call with Garbarino, inquiring about the status of the investigation.  Garbarino confirmed that he intended to move forward with the investigation, but needed a quorum of the Board to convene first and stated "good luck getting

these clowns to come to a meeting where we would have a quorum." Garbarino also stated that

he could not take any action, including restricting Venditti's computer/internal access, prior to a

Board vote for an investigation.

73. During Venditti's time on medical leave for the next several weeks, he continued

to issue directives to staff.

74. Plaintiff continued to follow-up with Garbarino in the coming weeks regarding

his analysis of evidence of FTCHS's sham Lottery, including through email communication.

75. Despite Plaintiff's diligent reminders and thorough explanations provided

multiple times in email and over the phone, during which the President of the Board admitted (on

several occasions) that he agreed that the Lottery's conduct constituted illegal practices and

indicated that he would need to present these concerns to the Charter Schools Office alongside

Plaintiff, Garbarino and the members of the Board failed to take any effective and timely action.

76. Instead, at Venditti's request, the Board held an emergency meeting at 6:00 P.M.

on February 27, 2023. After requesting to attend, Plaintiff was told by Garbarino that Garbarino

preferred that he not attend, and that he would not be permitted to attend regardless, as the

meeting had been deemed an "Executive Board Meeting." Garbarino told Plaintiff this despite

permitting other administrators not on the Board to attend the meeting.

77. During this meeting, Venditti formally resigned from the Board, with then-

immediate effect.

78. The Board also held a formal vote on the matter of whether to move forward with

an investigation against Venditti. Despite several members voting in the affirmative, the Board

voted down the investigation, letting Venditti resign with no formal investigation of his

egregious conduct constituting unlawful discrimination. Plaintiff was not permitted to vote.

79.     Instead, the attendees voted to provide Venditti with over $350,000 in combined retirement bonus payments and accrued personal and vacation time.

80.     At this emergency meeting that Plaintiff was not permitted to attend, Venditti was given the opportunity to provide his commentary on the investigation, which he used to retaliate against Plaintiff.

81.     Venditti not only revealed that he was aware of Plaintiff's identity as an administrator who sent good faith emails and had phone calls with the President of the Boars regarding Venditti's discriminatory and illegal actions, but used the opportunity to attack and malign Plaintiff's character.  Namely, Venditti cited an over ten-year-old larceny charge against Plaintiff that was dismissed and expunged (since it was baseless in nature), in an attempt to undermine the legitimacy of the charges and investigation, on the supposed grounds that Plaintiff was a "thief."  Additionally, Venditti falsely asserted before the Board that Plaintiff had pornography on his computer, a knowingly false statement with no factual basis.

82.     Upon learning of Venditti's verbal attacks and false statements, Plaintiff believed that further internal reporting would result in further retaliation.  Plaintiff's concerns materialized, as the Board has since engaged in cover-up tactics and Plaintiff has been subject to a hostile work environment, which has materially and adversely affected his conditions of employment.

83.     In addition to the Board not voting in favor of an investigation into Venditti's actions, the Board voted to affirm a resolution put forth by Venditti to appoint the Dean of Students as his successor as CEO of FTCHS to prevent Plaintiff from accessing additional evidence of the sham described herein, and to punish Plaintiff by denying him the opportunity for advancement.

84.    Venditti self-servingly maligned the investigation into his illegal conduct through *ad hominem* attacks that had no grounding in the potential investigation.  Venditti's reaction to the investigation was sufficient to suppress a potential investigation from his fellow Board members, who were subordinates to Venditti in all material respects.

85.    During the phone call in which Plaintiff learned that he would not be able to attend the Board meeting and express his concerns about the sham Lottery and Venditti's egregious actions, Garbarino informed Plaintiff that he should leave his position and simply get out of the "mad house" as a next course of action.  Plaintiff has failed to take the easy way out as Garbarino suggested, and maintained his position at FTCHS, despite fear of further retaliation in order to see that justice prevails in this matter.

86.    Garbarino proceeded to resign from the Board after serving as a member, including as President, of the Board for over 20 years.

87.    In fact, all members of the Board who voted to investigate Venditti's manipulation of the Lottery resigned from the Board in the ensuing weeks due to the Board's failure to take action to investigate Venditti and in protest over the decision to instead reward Venditti for his misconduct. ensuring his discrimination was successful.

**H.        Retaliation Against Plaintiff**

88.    Rather than properly investigate and remedy the discriminatory admissions practices perpetrated by the sham Lottery that Plaintiff reported, Defendants decided to cover up the misconduct and the numerous violations associated with FTCHS' discriminatory admissions practices.

89.    In doing so, and as a direct result of Plaintiff's activities as detailed herein throughout this Complaint, Defendants retaliated against Plaintiff by curtailing his job

responsibilities, permitting his professional reputation to be damaged, and limiting his future

potential professional advancement and related income increases.

90.    Plaintiff experienced marginalization and other hostility from co-workers from

the time he reported the unlawful conduct associated with the student lottery until April 2023.

91.    On April 18, 2023, through his counsel, Plaintiff communicated to FTCHS that its

sham lottery constituted a violation of Pennsylvania's Charter School Law and was aimed at

unlawfully discriminating against students based on their race and disability.  In this letter,

Plaintiff further apprised FTCHS that its ongoing retaliation against him constituted a violation

of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421-1428.  *Id.*

92.    On May 12, 2023, FTCHS responded in a letter that its Board of Directors had

convened an emergency meeting in which it voted to place Plaintiff "on paid administrative

leave until further notice."  FTCHS further warned that Plaintiff that he was:

> prohibited from returning to the School and shall not appear on
> School property for any reason. He is also prohibited from
> attending any and all school functions and/ or activities that occur
> off of school property. In addition, your client is hereby strictly
> prohibited from accessing any School files or the School network
> remotely while he is on administrative leave.  If your client has
> personal items in his office that he needs, kindly provide a list of
> those items and they will be delivered to his residence at which
> time, we demand he return any and all school property in your
> possession, including but limited to, the School laptop.

Plaintiff has not been permitted to return to employment since that date, has not been permitted

to pursue his chosen profession to his great distress and has not been able to secure alternative

employment despite diligent attempts to do so.

## I.    Applicable Law

93.    Discriminating against student applicants based on race, color, religion, sex, or

national origin, is a violation of Title VI of the Civil Rights Act of 1964 ("Title VI").

Defendants' retaliation against Plaintiff likewise violates Title VI, as well as Title VII of the Civil Rights Act of 1964 ("Title VII"), which protects individuals such as Plaintiff who oppose the creation of a racially discriminatory environment in the workplace.

94.     The discrimination against students with disabilities also constitutes a violation of the Americans with Disabilities Act ("ADA"), as well as of the Rehabilitation Act of 1973 ("Rehabilitation Act") and its implementing regulations, which hold that qualified handicapped people cannot be excluded from participation in, be denied benefits of, or be discriminated against by any program or activity that receives federal financial assistance, such as FTCHS. *See* 34 C.F.R. § 10 104.4(a). Likewise, Defendants' retaliation against Plaintiff violates the ADA and Rehabilitation Act.

95.     Defendants' conduct also violated Plaintiff's rights under 42 U.S.C. § 1981 and the Pennsylvania Whistleblower Law (protecting whistleblowers such as Plaintiff).

96.     Pennsylvania Charter schools are required to hold a lottery admissions process if they receive more applicants than the available spots. *See* 24 P.S. Education § 17-1723-A. A lottery randomly selects students for enrollment at a charter school but may include some possible acceptable factors to show preference to some student applicants.

97.     The Charter Schools Office for the School District of Philadelphia, which authorizes charter schools operating throughout Philadelphia, allows charter schools to show preference to some applicants based on the terms of their charter and enrollment policy. Acceptable factors for such preference include preference for potential students who have siblings currently attending the school, preference for specific feeder schools, or preference for the children of the charter school's founders. These possible preferences must be in accordance with the applicable school's charter and authorized by the School District of Philadelphia.

98.     A charter school cannot discriminate during its admissions process or through its admission policies on the basis of a child's disability, need for special education services, or on the basis of intellectual ability.  *See* 22 Pa. Code § 711.7(a)-(c).

99.     Charter schools are further prohibited from discriminating against student applicants based on ethnicity, age, religion, gender identity or expression (known or perceived), ancestry, national origin, marital status, pregnancy, socio-economic status, English language proficiency, political beliefs, veteran status, disability, athletic ability, intellectual ability, proficiency in the English language, measures of achievement or aptitude, or other protected classes.  24 Pa. Stat. §§ 17-1715-A, 1723-A; 20 U.S.C. § l 413(a)(5); 34 C.F.R.§ 300.209(b); 29 U.S.C. § 794; 34 C.F.R. §§ 104.4(a), (b).

100.    The Pennsylvania Fair Educational Opportunities Act similarly provides that all persons shall have equal opportunities for education regardless of their race, religion, color, ancestry, national origin, sex, handicap, or disability.  *See* 24 Pa. Stat. § 5002.

101.    The fair educational practices provisions of the Pennsylvania Human Relations Act ("PHRA") states that schools cannot ask questions of a student applicant in writing or orally that might even reveal their membership in any protected class(es).[6]

102.    In addition to being subject to anti-discrimination law, the Pennsylvania Fair Educational Opportunities Act requires that before September 1 of each year, every school subject to the Pennsylvania Fair Educational Opportunities Act must file with the Human Relations Commission ("Commission") a written statement setting forth in detail the procedures it follows in admitting students, including information disclosing who determines the admission policy, who executes the policy, what specific procedures are followed and what factors are

---

[6]Plaintiff reserves the right to assert claims under the PHRA through an amended pleading once all jurisdictional prerequisites have been satisfied.

taken into consideration in accepting or rejecting a student.  New or amended statements must be filed by a school if and when any changes in the admission procedures from those previously described in the written statement filed with the Commission are adopted by the school.  *See* 16 Pa. Code § 47.21.

103.    It is beyond cavil that Defendants' discriminatory acts constituted outrageous violations of federal and state law governing educational institutions and likewise that Defendants' retaliation against Plaintiff violated applicable federal and state laws.

## CAUSES OF ACTION

### Count I

### Unlawful Retaliation in Violation of Titles VI and VII of the Civil Rights Act of 1964

104.    Plaintiff incorporates and realleges the preceding paragraphs as if set forth fully herein.

105.    Title VI of the Civil Rights Act of 1964 ("Title VI") provides that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

106.    As Local Education Agencies ("LEAs") and recipients of federal financial assistance, charter schools like FTCHS constitute programs and activities that are subject to Title IV of the Civil Rights Act of 1964.  28 C.F.R. § 42.102(d)(ii).

107.    Title VI prohibits recipients of federal funds from retaliating against any individual from opposing a discriminatory practice that the individual reasonably believes constitutes a violation of Title IV or otherwise engaging in a protected activity under Title VI. *See, e.g., Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 522 (3d Cir. 2011).

108.     Plaintiff opposed the sham lottery admissions process by reporting to the President of the FTCHS Board of Directors, Joe Garbarino, in person and in writing, his grave concern that the sham lottery discriminated against applicants on the basis of race and had thereby been conducted in violation of applicable law, such as Title VI.

109.     Plaintiffs' numerous follow-ups and thorough explanations of the Title VI violation that the sham lottery constituted were the direct cause of FTCHS' retaliation against Plaintiff, as directed by Garbarino and the BOD members, through: (1) excluding Plaintiff from the February 27, 2023 BOD Meeting, which was used as an opportunity to besmirch Plaintiff's reputation; (2) changing the terms, conditions, and privileges of Plaintiff's employment through marginalization and ostracization; (3) suspending Plaintiff's employment without notice on May 12, 2023.

110.     Title VII likewise provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e(a).  Here, by their misconduct, Defendants have violated Title VII by retaliating against for him engaging in protected activity.

111.     As the direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages of the loss of future employment opportunities, loss of tenure, status, professional, and personal reputation, and severe physical and emotional distress.  Defendants' conduct also is outrageous in nature under all of the circumstances and justifies the imposition of appropriate exemplary damages under applicable law.

**Count II**

**Unlawful Retaliation in Violation of 42 U.S.C. § 1981**

112.     Plaintiff incorporates and realleges the preceding paragraph as if set forth fully herein.

113.     42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

114.     42 U.S.C. § 1981 likewise provides a cause of action to "an individual, whether black or white, who suffers retaliation because he has tried to help different individual, suffering direct racial discrimination, secure his § 1981 rights."  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452 (2008).

115.     Plaintiff engaged in a protected activity under § 1981 by reporting to the President of the FTCHS Board of Directors, Joe Garbarino, in person and in writing, of his grave concerns with the sham lottery that had been conducted in a discriminatory manner to intentionally favor students from certain zip codes and in violation of applicable laws against discrimination, such as § 1981, as well as by engaging in other related protected activity.

116.     Defendants responded by retaliating against Plaintiff in the numerous ways outlined and discussed above.

117.     As the direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages of the loss of future employment opportunities, loss of tenure, status, professional, and personal reputation, and severe physical and emotional distress.

**Count III**

**Unlawful Retaliation in Violation of the Americans with Disabilities Act**

118.    Plaintiff incorporates and realleges the preceding paragraph as if set forth fully herein.

119.    The Americans with Disabilities Act ("ADA"), 42 § 12101 *et seq.*, prohibits discrimination against any person based on physical or mental disability.

120.    The ADA likewise prohibits an employer from retaliating against an employee for engaging in a protected activity protected by the ADA, providing in pertinent part that, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12103.

121.    Plaintiff engaged in a protected activity under the ADA by reporting to the President of the FTCHS Board of Directors, Joe Garbarino, in person and in writing, of his grave concerns with the sham lottery that had been conducted in a manner that discriminated against student applicants with disabilities, in violation of applicable law, such as the ADA, as well as engaging in other protected conduct.

122.    Defendants responded by retaliating against Plaintiff in the numerous ways outlined and discussed above.

123.    As the direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages of the loss of future employment opportunities, loss of tenure, status, professional, and personal reputation, and severe physical and emotional distress.

28

**Count IV**

**Unlawful Retaliation in Violation of Section 504 of the Rehabilitation Act**

124.    The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* and its implementing regulations, prohibit exclusion of qualified handicapped people from participation in, be denied benefits of, or be discriminated against by any program or activity that receives federal financial assistance, such as FTCHS.  *See* 34 C.F.R. § 10 104.4(a).

125.    Section 504 of the Rehabilitation Act likewise prohibits retaliation against individuals who engage in protected activities, such as reporting violations of the Rehabilitation Act.

126.    Plaintiff engaged in a protected activity under the Rehabilitation Act by reporting to the President of the FTCHS Board of Directors, Joe Garbarino, in person and in writing, of his grave concerns with the sham lottery that had been conducted in violation of the Rehabilitation Act, as well as engaging in other protected activity.

127.    Defendants responded by retaliating against Plaintiff in the numerous ways discussed above.

128.    As the direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages of the loss of future employment opportunities, loss of tenure, status, professional, and personal reputation, and severe physical and emotional distress.

**Count V**

**Unlawful Retaliation in Violation of the Pennsylvania Whistleblower Law**

129.    Plaintiff incorporates and realleges the preceding paragraph as if set forth fully herein.

130.    The Pennsylvania Whistleblower Law provides that "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee ... makes a good faith report ... to the employer or appropriate authority [of] an instance of wrongdoing or waste."  42 P.S. § 1423(a).

131.    The Pennsylvania Whistleblower Law defines "wrongdoing as [a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation."

132.    As outlined above, Plaintiff alerted Defendants of the numerous violations he discovered arising from its sham admissions and lottery process that discriminated against students on the basis of race and disability.   43 P.S. § 1422.

133.    Defendants responded by retaliating against Plaintiff in the numerous ways outlined and discussed above.

134.    As the direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages of the loss of future employment opportunities, loss of tenure, status, professional, and personal reputation, and severe physical and emotional distress.

**Count VI**

**Defamation/Slander/False Light**

135.    Plaintiff incorporates and realleges the preceding paragraph as if set forth fully herein.

136.    As outlined above, Venditti defamed and slandered Plaintiff by making false statements against him and placing him in a false light.  The defamatory nature of the statements by Venditti is virtually indisputable.

137.    The individuals to whom Venditti published his slanderous statements about Plaintiff understood the meaning of the statements and that they applied to Plaintiff.  Moreover, those statements placed Plaintiff in a false and negative light under all of the circumstances.

138.    Venditti meant the slanderous statements to apply to Plaintiff and understood that the individuals to whom he published these lies and false suggestions understood that Venditti was speaking directly about Plaintiff.

139.    Plaintiff has suffered physical and emotional distress and special harm as a result of the publication of Venditti's slanderous and false statements.

140.    Venditti also abused any conditional privileges that could be deemed applicable to his false statements, which were outrageous and malicious in nature, thereby justifying the imposition of punitive damages.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a judgment providing the following relief:

a.  Finding that Defendants' conduct violated Title VI of the Civil Rights Act, Title VII of the Civil Rights Act, the ADA, the Rehabilitation Act, and the Pennsylvania Whistleblower Law by retaliating against Plaintiff and taking other adverse actions against him;

b.  Finding that Venditti defamed Plaintiff;

c.   Awarding compensatory damages for the economic and non-economic losses suffered by Plaintiff, including the physical and emotional harm and distress, as well as injury to reputation, that he has suffered;

d.  Awarding Plaintiff punitive or exemplary damages to the maximum extent permitted by applicable law;

    e.   Awarding Plaintiff attorneys' fees and all recoverable expenses of litigation; and

    f.    Granting such other relief that the Court may deem just and appropriate under all of the circumstances.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

Dated: November 24, 2023

/s/ Eric L. Young
Eric L. Young
YOUNG LAW GROUP P.C.
3031 C Walton Rd., Suite 301
Plymouth Meeting, PA 19462
Telephone: (215) 367-5151
Facsimile:  (215) 367-5143
Email: eyoung@young-lawgroup.com

James C. Shah
Alec J. Berin
Christopher A. Miller
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103 133
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
       ajberin@millershah.com
       camiller@millershah.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
       lrubinow@millershah.com

*Attorneys for Plaintiff*